UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, et al., | NO:  12-CV-0109-TOR |
| Plaintiffs, | ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO TRANSFER |
| v. | |
| BUILDING AND CONSTRUCTION TRADES DEPARTMENT, et al., | |
| Defendants. | |

BEFORE THE COURT are Defendants' Motion to Transfer to the District Court for the District of Columbia, ECF No. 45, and Defendants' Motion to Dismiss the complaint for failure to state a claim upon which relief can be granted, ECF No. 57.  These matters were heard with oral argument on October 24, 2012. Daniel M. Shanley and C. Matthew Andersen appeared on behalf of the Plaintiffs. Leon Dayan and Carl J. Oreskovich appeared on behalf of Defendants.  The Court

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO TRANSFER ~ 1

has reviewed the relevant pleadings and supporting materials, and is fully informed.

## BACKGROUND

The United Brotherhood of Carpenters and Joiners of America ("UBC") together with six subordinate bodies of the UBC and 19 individual UBC members (together "Plaintiffs") bring nine claims against the Building and Construction Trades Department ("BCTD") and three individuals: James Williams, president of a BCTD affiliate International union of Painters and Allied Trades ("IUPAT"), Ron Ault, president of the Metal Trades Department of the AFL-CIO ("MTD"), and David Molnaa, president of a local Hanford MTD council (together "Defendants").  These claims include four brought under the Racketeering Influenced and Corrupt Organizations Act ("RICO"), one under the Labor Management Reporting and Disclosure Act of 1959 ("LMRDA"), and four state law claims.

## FACTS

The BCTD is a labor organization that oversees and coordinates the activities of several subordinate trade unions (electricians, painters, laborers, plumbers).  These subordinate unions pay dues to the BCTD and must comply with BCTD rules.  The UBC is not associated with the BCTD, and is "unwilling to submit to [BCTD] control or to pay in perpetuity … a monthly fee … for services

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO TRANSFER ~ 2

neither requested, wanted, nor necessary." Compl. ¶ 130.  Plaintiffs allege that the BCTD and its affiliates, in response to what they perceived to be an unwanted incursion on the traditional jurisdiction of other building trade unions, have embarked on the "Push-Back Carpenters Campaign" to pressure the UBC to re-affiliate with the BCTD.

The Complaint alleges economic pressure by Defendants, including: promoting a 2008 AFL-CIO resolution authorizing the AFL-CIO to charter a union to compete with the UBC, the organization of a "Unity Rally" in St. Louis, repeated public criticism of the UBC on websites and in other publications, filing frivolous regulatory claims against the UBC, stealing confidential information, "forcing" UBC's Seattle legal counsel to terminate its relationship with the Plaintiffs, and orchestrating the June 2011 termination of an affiliation agreement ("Solidarity Agreement") between the UBC and MTD.  The Complaint also alleges acts of vandalism and threats of force by "BCTD Defendants' agents," including: vandalism of UBC jobsites and property (sugar in gas tank, smashing sign, spray painting trucks), death threats against Terry Nelson (senior officer of St. Louis UBC), death threats against Ed Marston (a UBC representative), threats of violence at Pier 66 in Seattle, and the public dissemination of video footage of a violent attack on UBC members.

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO TRANSFER ~ 3

The Complaint alleges that the individually named Defendants played "key roles" in the anti-UBC conspiracy. Defendants Ault and Molnaa allegedly carried out the "bad faith" termination of the Solidarity Agreement with the MTD. Defendant Williams allegedly "authorized the campaign to push back the Carpenters" as a member of the BTCD Executive Council, helped form the anti-Plaintiff "Committee," and approved anti-Plaintiff publications.

Once the rhetoric and pejorative allegations are peeled back, Plaintiffs' dispute is rather straightforward. The UBC is a trade union that disagrees with various policies of the BTCD and its unified strategy of affiliating with other trade unions under the umbrella of the AFL-CIO. The MTD, an affiliated union, had allowed the UBC to affiliate with it through a "Solidarity Agreement." The Defendants allegedly convinced the MTD to terminate the "Solidarity Agreement" because the UBC was creeping into other trades' work and were not paying their fair share. The UBC now seeks to go at it alone but is perceived as a competing union by the BTCD. The BTCD seeks greater strength and bargaining power by having UBC reaffiliate with it on equal footing as all other affiliated unions, rather than being a competitor union.

///

///

///

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO TRANSFER ~ 4

**DISCUSSION**

**I.    Motion to Dismiss**

**A.  Standard of Review**

To withstand a motion to dismiss pursuant to Rule 12(b)(6), a complaint must set forth factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*. ("Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Id*.

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The pleading standard set by Rule 8 of the Federal Rules of Civil Procedure "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)  Rule 8 marks a notable and generous departure

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO TRANSFER ~ 5

from the hyper-technical, code-pleading regime of a prior era, but it does not

unlock the doors of discovery for a plaintiff armed with nothing more than

conclusions. *Id.* at 678-79. In assessing whether Rule 8(a)(2) is satisfied, the

Court first identifies the elements of the asserted claim based on statute or case

law. *Id.* at 678. The Ninth Circuit follows the methodological approach set forth

in *Iqbal* for the assessment of a plaintiff's complaint:

> "[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."

*Moss v. U.S. Secret Service*, 572 F.3d 962, 970 (9th Cir. 2009) (*quoting Iqbal*, 129

S.Ct. at 1950).[1]

---

[1] Rule 12(f) of the Federal Rules of Civil Procedure allows the court to strike from "any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." The purpose of a Rule 12(f) motion is to avoid the costs that arise from litigating spurious issues by dispensing with those issues prior to trial. *Sidney–Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983). Immaterial matter is defined as matter that "has no essential or important relationship to the claim for relief or the defenses being pleaded."

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING
DEFENDANTS' MOTION TO TRANSFER ~ 6

1

**B. Civil RICO Claims**

2   RICO's private right of action, 18 U.S.C. § 1964(c), provides in relevant part

3   that "[a]ny person injured in his business or property by reason of a violation of

4   section 1962 of this chapter may sue therefor in any appropriate United States

5   district court and shall recover threefold the damages he sustains and the cost of

6   the suit, including a reasonable attorney's fee."  Plaintiffs seek relief under three

7   substantive subsections of the RICO Act, 18 U .S.C. § 1962(a), (b), and (c).  In

8   their First Claim for Relief, Plaintiffs contend Defendants conspired to violate 18

9   U.S.C. § 1962(a) which prohibits a person who receives income derived from a

10  pattern of racketeering activity from using or investing such income in an

11  enterprise engaged in interstate commerce.  In their Second Claim for Relief,

12  Plaintiffs contend Defendants conspired to violate § 1962(b), which makes it

13  unlawful for a person through a pattern of racketeering activity to acquire or

14  maintain interest or control of an enterprise engaged in interstate commerce.  In

15  their Third Claim for Relief, Plaintiffs contend Defendants to violated § 1962(c)

16  which prohibits a person employed by or associated with any enterprise engaged in

17  interstate commerce to conduct or participate in the conduct of the enterprise

18  through a pattern of racketeering activity.  In their Fourth Claim for Relief,

19  Plaintiffs contend Defendants conspired to violate § 1962(c).

20

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING
DEFENDANTS' MOTION TO TRANSFER ~ 7

The elements of a civil RICO claim are: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as predicate acts) (5) causing injury to plaintiff's business or property." *Living Designs, Inc. v. E.I. Dupont de Nemours and Co.*, 431 F.3d 353, 361 (9th Cir. 2005); *Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007) (en banc) (describing first four elements); *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496-497 (1985) (describing first four elements and "[i]n addition, the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation."). Defendants allege that Plaintiffs fails to state a claim on three of the RICO elements, including: (1) pattern, (2) of racketeering activity (known as predicate acts), and (3) injury to plaintiffs' business or property. The Court will examine each of these elements in reverse order.

### 1. Injury to Business or Property

All four of Plaintiffs' RICO causes of action are predicated upon 18 U.S.C. § 1964(c). Section 1964(c) requires an injury to business or property. Defendants contend Plaintiffs have failed to properly plead even a single act of attempted extortion and argue that none of the property alleged to have been damaged or destroyed is alleged to have been owned by any Plaintiff, as opposed to a non-party employer or a non-party individual Carpenter member.

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO TRANSFER ~ 8

Plaintiffs contend they have properly pleaded injury to their business or property.  The complaint recites the following:

> [T]he Carpenters have suffered substantial concrete financial injury from overt and predicate acts of the conspiracy to their[2] business or property within the meaning of 18 U.S.C. § 1964(c), including but not limited [sic] lost members and dues, lost or reduced promotional, contractual and/or membership recruitment opportunities, loss of confidential information, increased costs due to the termination of contractual relations with its attorneys, and substantial and irreparable loss of goodwill and membership recruitment opportunities in an amount to be determined at trial.

First, Second, Third and Fourth Claims for Relief, ECF No. 1 at ¶¶ 421, 428, 434, and 439.  While these are mere formulaic recitations, Plaintiffs provided additional, specific factual allegations that property was damaged through the alleged acts of vandalism including: "poured sugar in the gas tank and spray painted their 'No 57' calling card on two trucks used by the Carpenters' members and on two buildings where the Carpenters' members worked," (Compl. ¶ 14); threw bricks through the window of a Carpenters''' work truck (Compl. ¶ 156); "smashed a $20,000 work sign" (Compl. ¶ 160); and destroyed a fence at a

---

[2]  The Third Claim for relief, which alleges a substantive as opposed to a conspiracy violation, omits the phrase "from overt and predicate acts of the conspiracy to their business" and replaces it with "to its business."  ¶ 434.

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO TRANSFER ~ 9

Carpenters' work site (Compl. ¶ 30). ECF No. 90 at 33. However, Plaintiffs fail to plead that any of this property belonged to the UBC or to any named Plaintiff.

Plaintiffs argue that even if these individual acts caused no harm, it is sufficient to plead an overall pattern of illegal activity harmed the Plaintiffs including economic injury such as job loss, involuntary payment of dues and for the UBC, loss of dues and members. ECF No. 90 at 32-33. The Supreme Court instructs:

> Section 1962(c) . . . forbids conducting or participating in the conduct of an enterprise's affairs through a pattern of racketeering activity. The Court has indicated the compensable injury flowing from a violation of that provision "necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise."

*Sedima, S.P.R.L. v. Imrex Co*., 473 U.S. 479, 497 (1985). Furthermore, generalized statements of harm do not suffice. The property injury must flow directly from the substantive racketeering activity:

> A RICO plaintiff cannot circumvent the proximate-cause requirement simply by claiming that the defendant's aim was to increase market share at a competitor's expense. *See Associated Gen. Contractors*, 459 U.S., at 537, 103 S.Ct. 897 ("We are also satisfied that an allegation of improper motive . . . is not a panacea that will enable any complaint to withstand a motion to dismiss"). When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries.

*Anza v. Ideal Steel Supply Corp*., 547 U.S. 451, 460-61 (2006). In *Anza*, a corporate plaintiff brought an action against a business competitor for engaging in

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO TRANSFER ~ 10

an unlawful racketeering scheme aimed at gaining sales and market share at its expense. *Id*. at 454. The Supreme Court upheld the district court's dismissal of the RICO claims. The Court found that the cause of the harms suffered by the plaintiff in *Anza* was "a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State) [,]" and that there was clearly an "absence of proximate causation. . . ." *Id*. at 458. The Court explained that a party's lost sales could result from factors other than an alleged wrongdoer's acts of fraud. *Id*. at 459. "Businesses lose and gain customers for many reasons, and it would require a complex assessment to establish what portion of Ideal's lost sales were the product of National's decreased prices." *Id*.

In *Sybersound Records v. UAV Corp.*, 517 F.3d 1137 (9th Cir. 2008), the Ninth Circuit upheld the dismissal of a plaintiff's RICO claims under § 1962(a) and (c). The Ninth Circuit applied *Anza* 's logic and holding in that case where an economic competitor alleged RICO violations based on predicate acts of mail and wire fraud and copyright infringement against entities other than itself. *Id*. at 1149. The court touched on the fact that a business's lost sales may be attributable to many different reasons; and that a court would need to engage in a speculative and complicated analysis to determine what percentage of sales were attributable to the defendants' decision to lower their prices or a customer's preference, instead of to the alleged predicate acts. *Id*. at 1148-49. The court concluded that the plaintiff did

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO TRANSFER ~ 11

not have standing to assert a RICO violation under § 1962(a) or (c) because the

alleged fraudulent acts did not proximately cause the plaintiff's injuries.  *Id*. at

1150.

"[A] plaintiff seeking civil damages for a violation of § 1962(a) must allege

facts tending to show that he or she was injured by the use or investment of

racketeering income." *Nugget Hydroelectric L.P. v. Pacific Gas & Elec. Co.,* 981

F.2d 429, 437 (9th Cir. 1992).  Plaintiffs therefore must allege that the investment

of racketeering income was the proximate cause of their injuries. "Reinvestment of

proceeds from alleged racketeering activity back into the enterprise to continue its

racketeering activity is insufficient to show proximate causation." *Sybersound*

*Records, Inc. v. UAV Corp*., 517 F.3d 1137, 1149 (9th Cir. 2008).

Under § 1962(b), the plaintiff must allege an injury directly and proximately

caused by the defendant's control over a RICO enterprise. *See Wagh v. Metris*

*Direct, Inc.*, 348 F.3d 1102, 1111 (9th Cir. 2003), *overruled on other grounds*,

*Odom v. Microsoft Corp*., 486 F.3d 541 (9th Cir. 2007) (en banc). This means

Plaintiffs must allege facts sufficient to assert standing and "a specific nexus

between the control of the enterprise and the racketeering activity." *Id.* (quotation

marks and citation omitted).

As with their claims under § 1962(a), Plaintiffs have failed to allege a

separate and distinct injury from the injuries incurred from the predicate acts

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING
DEFENDANTS' MOTION TO TRANSFER ~ 12

performed during the conduct of the enterprise. *See Sybersound*, 517 F.3d at 1149. Plaintiffs' lack of standing to bring their civil RICO claims due to the absence of proximate cause between the alleged predicate acts and their competitive injuries therefore dooms their claim under § 1962(b) as well.

Here, Plaintiffs blame their alleged loss of jobs, loss of dues and members on Defendants' unlawful extortionate attacks.  They claim they lost business opportunities, employee productivity and time, and have incurred additional costs and expenses.  However, the Court finds no direct link between the attempted extortion allegedly committed by Defendants and Plaintiffs' losses.  As in *Sybersound*, Plaintiffs' harms here are too attenuated from the alleged conspiracy and attempted extortion to give them standing under the civil RICO Act.

## 2.  Predicate Acts

RICO defines "racketeering activity" to include a host of so called predicate acts, including "any act which is indictable under" the Hobbs Act as well as "any act or threat involving . . . extortion . . . , which is chargeable under State law and punishable by imprisonment for more than one year." 18 U.S.C. § 1961(1)(A)-(B); *see also Rothman v. Vedder Park Mgmt*., 912 F.2d 315, 316 (9th Cir. 1990).  The Hobbs Act criminalizes interference with interstate commerce by extortion, 18 U.S.C. § 1951(a), extortion being defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force,

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO TRANSFER ~ 13

1   violence, or fear, or under color of official right," 18 U.S.C. § 1951(b)(2).

2          In order for a state offense to qualify as a predicate act in a RICO suit it must

3   be "capable of being generically classified as extortionate … [which is] defined as

4   'obtaining something of value from another with his consent induced by wrongful

5   use of force, fear, or threats.'" S*cheidler v. Nat'l Org. for Women, Inc.,* 537 U.S.

6   393, 409 (2003); *see also Wilkie v. Robbins*, 551 U.S. 537, 567 (2007) (rejecting

7   plaintiff's "fall back" argument that defendants' violation of Wyoming's blackmail

8   statute was a separate predicate offense because "the conduct alleged does not fit

9   the traditional definition of extortion, so [the] RICO claim does not survive on a

10  theory of state-law derivation").

11         In *Enmons*, the Supreme Court decided "whether the Hobbs Act proscribes

12  violence committed during a lawful strike for the purpose of inducing an

13  employer's agreement to legitimate collective-bargaining demands."  *United States*

14  *v. Enmons*, 410 U.S. 396, 399 (1973).  First, the Supreme Court had to decide what

15  the word "wrongful" means within the Hobbs Act.

16         '[W]rongful' has meaning in the Act only if it limits the statute's
           coverage to those instances where the obtaining of the property would
17         itself be 'wrongful' because the alleged extortionist has no lawful
           claim to that property.
18
           Construed in this fashion, the Hobbs Act has properly been held to
19         reach instances where union officials threatened force or violence
           against an employer in order to obtain personal payoffs, and where
20         unions used the proscribed means to exact 'wage' payments from
           employers in return for 'imposed, unwanted, superfluous and fictitious

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING
DEFENDANTS' MOTION TO TRANSFER ~ 14

services' of workers.  For in those situations, the employer's property has been misappropriated. But the literal language of the statute will not bear the Government's semantic argument that the Hobbs Act reaches the use of violence to achieve legitimate union objectives, such as higher wages in return for genuine services which the employer seeks. In that type of case, there has been no 'wrongful' taking of the employer's property; he has paid for the services he bargained for, and the workers receive the wages to which they are entitled in compensation for their services.

*Enmons*, 410 U.S. at 400 (footnotes omitted).  Next, the Supreme Court ruled that the legislative framework of the Hobbs Act makes clear that the Act does not apply to the use of force to achieve legitimate labor ends.  *Id*. at 401.  Rejecting the Government's argument to the contrary, it reasoned:

The Government's broad concept of extortion—the 'wrongful' use of force to obtain even the legitimate union demands of higher wages— is not easily restricted. It would cover all overtly coercive conduct in the course of an economic strike, obstructing, delaying, or affecting commerce. The worker who threw a punch on a picket line, or the striker who deflated the tires on his employer's truck would be subject to a Hobbs Act prosecution and the possibility of 20 years imprisonment and a $10,000 fine.

* * *

[I]t would require statutory language much more explicit than that before us here to lead to the conclusion that Congress intended to put the Federal Government in the business of policing the orderly conduct of strikes. Neither the language of the Hobbs Act nor its legislative history can justify the conclusion that Congress intended to work such an extraordinary change in federal labor law or such an unprecedented incursion into the criminal jurisdiction of the States.

*Enmons*, 410 U.S. at 410-11 (footnotes and citations omitted).  The Ninth Circuit recognized the scope of the *Enmons* labor exception:

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO TRANSFER ~ 15

The Supreme Court observed that "[t]he legislative framework of the Hobbs Act ... makes it clear that the Act does not apply to the use of force to achieve legitimate labor ends." However, "when the objectives of the picketing changed from legitimate labor ends to personal payoffs, then the actions became extortionate."

*United States v. Daane*, 475 F.3d 1114, 1119 (9th Cir. 2007) (citations omitted); *see also United States v. Thordarson*, 646 F.2d 1323, 1326-27 (9th Cir. 1981) ("We read *Enmons* as holding only that the use of violence to secure legitimate collective bargaining objectives is beyond the reach of the Hobbs Act.").

### a. State Law vs. Hobbs Act Predicate Acts

Defendants contend that the elements necessary to establish a "predicate act" are the same regardless of whether plaintiff pleads only a Hobbs Act violation, or as in this case, pleads both extortion under the Hobbs Act, and extortion in violation of state statutes. Specifically, Defendants contend that in order to allege a predicate act under either the Hobbs Act, or a state extortion statute, Defendants' alleged conduct must involve a "wrongful use" of force, fear or threats.

According to Plaintiffs, "collapsing" the state law extortion definition into the Hobbs Act extortion definition would "destroy the explicit conjunctive choice that Congress provided to plaintiffs under RICO," citing *Smithfield Foods Inc. v. United Food & Comm. Workers Int'l Union*, 585 F.Supp. 2d 789, 802 (E.D. Va. 2008) ("*Smithfield II*"). *Smithfield II* held that "in light of the text and legislative

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO TRANSFER ~ 16

1    history of 18 U.S.C. § 1961(1), and the subsequent decisions interpreting the RICO

2    statute, it is clear that the Hobbs Act's definition of "wrongful"…does not apply to

3    the state law extortion predicates of [plaintiff's] RICO claims."  Plaintiffs argue

4    that the differences Hobbs Act extortion and state-law extortion statutes are

5    significant in defining the scope of the predicate act.  ECF No. 90 at 21.

6        The Court disagrees. The Supreme Court has spoken very clearly on this

7    point.

8        [E]ven assuming that defendants' conduct would be "chargeable under
         State law and punishable by imprisonment for more than one year,"
9        18 U.S.C. § 1961(1)(A), it cannot qualify as a predicate offense for a
         RICO suit unless it is "capable of being generically classified as
10       extortionate," *Scheidler,* 537 U.S., at 409, 410, 123 S.Ct. 1057;
         *accord, United States v. Nardello*, 393 U.S. 286, 296, 89 S.Ct. 534, 21
11       L.Ed.2d 487 (1969).

12   *Wilkie v. Robbins*, 551 U.S. 534, 567 (2007).  This rule of statutory construction,

13   applying the generic label to a term, is very familiar to the Supreme Court.

14   *Scheidler,* 537 U.S., at 402-3.  In *Scheidler,* the Supreme Court began with a

15   general presumption that a statutory term has its common law meaning.  *Id*. at 402.

16   Then, the Supreme Court reviewed the two sources of law Congress used as

17   models in formulating the Hobbs Act in 1946: the Penal Code of New York and

18   the Field Code, a 19th-century model penal code.  *Id*. at 403.  The Court

19   determined that Congress meant "generic" extortion, defined as "obtaining

20   something of value from another with his consent induced by the wrongful use of

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING
DEFENDANTS' MOTION TO TRANSFER ~ 17

1  force, fear, or threats." *Id.*, 537 U.S. at 409.  That definition encompasses all of the

2  core elements of the term as recognized by the Model Penal Code and a majority of

3  States.  *See Scheidler*, 537 U.S. at 410; *see also Taylor v. United States*, 495 U.S.

4  575, 590 (1990) (Interpreting the Armed Career Criminal Act: There is no

5  "indication that Congress ever abandoned its general approach . . . of using

6  uniform, categorical definitions to capture all offenses . . . regardless of technical

7  definitions and labels under state law. . .. [I]t seems to us to be implausible that

8  Congress intended the meaning . . . to depend on the definition adopted by the

9  State.").

10      The Court is unpersuaded by Plaintiffs' attempt to distinguish *Scheidler* by

11  arguing that the holding in that case was expressly limited to the proposition that

12  state crimes having a different label than "extortion" can only establish RICO

13  predicate acts if they contain the same "obtaining property" requirement as the

14  Hobbs Act. ECF No. 90 at 23. While the Court recognizes that the particular

15  language at issue in *Scheidler* was the requirement that a party must "obtain or

16  seek to obtain property," the Supreme Court explicitly relied on the "generic"

17  extortion definition, which included the "wrongful use of fear, force, or threats."

18  *See Scheidler*, 537 U.S. at 409-10.  Accordingly, this Court rejects Plaintiffs'

19  argument that the varied States' laws supply differing definitions of extortion for

20  purposes of the federal RICO statute.  In order to allege a predicate act under either

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING
DEFENDANTS' MOTION TO TRANSFER ~ 18

the Hobbs Act, or a state extortion statute, Defendants' alleged conduct must involve a "wrongful use" of force, fear or threats.

### b. Extortion through Economic Pressure/Fear

As indicated above, to qualify as a predicate act under the Hobbs Act (and state law) the alleged conduct must involve "wrongful use" of force, fear, or threats to obtain property. 18 U.S.C. § 1951(b)(2).  This "fear" may be of economic loss as well as threats of physical violence.  *Brokerage Concepts v. U.S. Healthcare*, 140 F.3d 494, 503 (3rd Cir. 1998). However,

> [u]nlike the use or threatened use of force or violence, the use of economic fear in business negotiations between private parties is not "inherently" wrongful. Indeed, the fear of economic loss is a driving force of our economy that plays an important role in many legitimate business transactions. This economic reality leads us to conclude that the reach of the Hobbs Act is limited in cases, such as this one, which involve the use of economic fear in a transaction between two private parties. The limitation we apply is that set forth in *Enmons*: that a defendant is not guilty of extortion if he has a lawful claim to the property obtained.

*Brokerage Concepts v. U.S. Healthcare*, 140 F.3d at 523 (referring to *United States v. Enmons*, 410 U.S. 396 (1973)).  The parties appear to agree that whether the threat of economic harm is wrongful under the Hobbs Act depends on whether defendant has a "lawful claim" to the property he seeks to obtain.  However, there is great dispute as to whether Defendants in this case were engaged in "lawful" hard-bargaining or "unlawful" extortion.

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO TRANSFER ~ 19

Defendants refer the Court to "an unbroken line of appellate cases" in support of their argument that the alleged fear of economic loss employed by Defendants to accomplish re-affiliation of the UBC with the BCTD is a "legitimate business transaction" involving an "exchange" of "valuable consideration" between the parties.  ECF No. 58 at 8 (*citing Brokerage Concepts*, 140 F.3d at 523, 526).  They rely most heavily on *Brokerage Concepts*, a Third Circuit case that set aside a jury verdict in a civil RICO and found that the defendant HMOs (health maintenance organizations) use of economic fear to induce a pharmacy (Gary's) to terminate their contract with plaintiffs and enter into a contract with defendants was not wrongful under the Hobbs Act, and was instead the result of hard business bargaining.  *Brokerage Concepts*, 140 F.3d at 522.  The court repeatedly stated its holding was limited to a very narrow subset of extortion cases that involve alleged "wrongful use of economic fear where the two parties have engaged in a mutually beneficial exchange of property."  *Id*. at 525-26 (emphasis added).  Under the specific facts of that case, the court found that plaintiff's extortion claim could not survive because Gary's did not have a right to pursue business interests free of the fear that it would be excluded from Defendant's provider network.  *Id*. at 526.  Thus, because Gary's had no right of access to defendant's network, and defendant could have denied access for any reason, the defendant "had a right to exchange the valuable consideration of inclusion in its network in return for consideration

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO TRANSFER ~ 20

from Gary's in the form of its TPA [third party administrator] contract." *Id.*

The court in *Brokerage Concepts* relied on a "particularly illuminating" district court case in which defendants were accused of buying stock in plaintiff's company and then coercing plaintiff to buy stock back in return for defendant's agreement not to pursue a hostile takeover. *See Viacom Int'l v. Icahn*, 747 F. Supp. 205 (S.D.N.Y. 1990). The *Viacom* court reasoned that

> [t]he difference between "hard-bargaining" and extortion is as follows: In a "hard-bargaining" scenario the alleged victim has no pre-existing right to pursue his business interests free of the fear he is quelling by receiving value in return for transferring property to the defendant, but in an extortion scenario the alleged victim has a pre-existing entitlement to pursue his business interests free of the fear he is quelling by receiving value in return for transferring property to the defendant.

*Id.* at 213; *see also George Lussier Enterprises, Inc. v. Subaru of New England, Inc.,* 393 F.3d 36, 50 (1st Cir. 2004) (dealer's "conditioning of access to cars [by requiring that dealers purchase certain accessories] to which dealers had no pre-existing entitlement represents hard bargaining, not unlawful extortion."). Thus, the court found that plaintiff received something of value (eleven year standstill on threat of hostile takeover) in return for its consideration, and defendants had a lawful claim to that consideration because plaintiffs had no preexisting legal right to pursue business interests free of fears caused by defendant's takeover threats. *Id.* Defendants' use of economic fear was not extortion but rather "hard

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO TRANSFER ~ 21

bargaining" "in a deal which resulted in plaintiff receiving a benefit to which it was not otherwise entitled by law." *Id*.

More recently, the Seventh Circuit affirmed a 12(b)(6) dismissal of a RICO extortion claim in which defendant told plaintiff that he was terminating their joint venture agreement and he could take a very low price or "walk away with nothing." *Rennell v. Rowe*, 635 F.3d 1008, 1009 (7th Cir. 2011). The court found this demand was lawful in light of defendant's contractual right to terminate the joint venture without cause and defendant "was engaged in nothing more than unpleasant hard dealing." *Id*. at 1013-14.

Plaintiffs' Complaint generally alleges that Defendants "have no lawful claim or any other claim of right to any of the money or other property extortionately demanded from the Carpenters." Compl. ¶ 288. The "property" Defendants allegedly seek to obtain without lawful claim includes Plaintiffs' rights to: pursue members and recruits, collect monthly dues from members, recruit and train members and otherwise participate in union business free from interference, negotiate their own labor agreements, resolve jurisdictional disputes, determine which political candidates to support or oppose. ECF No. 90 at 18 (citing Compl. ¶ 2). Plaintiffs cite *United States v. Zemek*, 634 F.2d 1159, 1174 (9th Cir. 1980) for the proposition that "property" under the Hobbs Act is not limited to tangible things; rather, "[t]he right to make business decisions and to solicit business free

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO TRANSFER ~ 22

from wrongful coercion is a protected property right." The holding in *Zemek* is of dubious value given the Supreme Court's apparent holding that interference and disruption of health care centers and those who seek abortions does not constitute the "obtaining" of property under the Hobbs Act. *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. at 400-411; *see also Scheidler*, 537 U.S. at 414 (Justice Stevens dissenting) (citing *United States v. Zemek* as an example of those cases the majority rejected by its holding).

Plaintiffs make the entirely conclusory argument, with no basis in case law, that if "Defendants had a lawful claim to [Plaintiffs'] property, then they could use lawful means (e.g. a lawsuit) to recover it." ECF No. 90 at 17. Plaintiffs also seek to distinguish the case law cited by Defendants (and outlined in detail above) as involving only claims arising from a pre-existing contract and extortion related to that contract. Thus, according to Plaintiffs, due to the lack of contractual relationship between Defendants and Plaintiffs there can be no "lawful claim" to Plaintiffs property to justify dismissal of their claims. *Westways World Travel v. AMR Corp.*, 182 F.Supp. 2d 952, 956-57 (C.D. Cal. 2001) ("because plaintiffs allege that defendants had no contractual or other legal basis to collect money from them, plaintiffs have sufficiently alleged facts which constitute multiple acts of extortion"). The Court finds this argument unavailing. The application of this type of reasoning, when taken to its logical conclusion, is that there can never be a

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO TRANSFER ~ 23

viable "claim of right" defense to alleged extortionate behavior if the parties at issue are not in a contractual relationship.  The reasoning applied in the line of cases cited by Defendants examines (1) whether a demand involved an exchange of valid consideration on both sides, and (2) whether the "victim" had a pre-existing entitlement to pursue his business interests free of the fear caused by economic pressure.  *See Brokerage Concepts*, 140 F.3d at 525-26; *Viacom Int'l*, 747 F. Supp. at 213.  While this pre-existing entitlement could certainly include a contractual relationship, the existence of said relationship does not foreclose an analysis of whether Defendants' use of economic pressure was "lawful."

Defendants argue that an affiliation agreement between individual labor unions like the UBC, and an association of labor unions like the BCTD that charge a fee in exchange for providing services and benefits, involves a lawful exchange of valuable consideration. ECF No. 58 at 13 (*citing Brokerage Concepts*, 140 F.3d at 523).  As indicated in the Complaint, the UBC itself has "hundreds of affiliated Councils and local union," was once affiliated with the AFL-CIO, and alleges that the decision by the MTD to terminate its affiliation with the UBC has resulted in injuries to the UBC resulting in Plaintiff's demand for an injunction compelling reinstatement of that affiliation and restoration of Plaintiff's rights and privileges. Compl. ¶ 1, ¶¶ 232-245, ¶473.  Thus, Defendants argue that they are engaged in lawful hard-bargaining involving an exchange of valuable consideration, not

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO TRANSFER ~ 24

1    unlawful extortion.  ECF No. 58 at 14-15.

2         Plaintiffs respond that, as distinguished from the case law cited by

3    Defendants, they do not "want" any transaction with the Defendants on any terms.

4    ECF No. 90 at 20 (*citing* Compl. ¶ 4, 131, 136, 293).  Plaintiffs argue that

5    extortionists often claim their victims are receiving something of value but it is still

6    extortion when the alleged "value" is "imposed, unwanted, superfluous, and

7    fictitious."  *See Brokerage Concepts*, 140 F.3d at 525 (*citing Viacom Int'l*, 747

8    F.Supp. at 213); *Enmons*, 410 U.S. at 400 (1973).

9         The Court agrees with Defendants that Plaintiffs' "mantra-like, pejorative

10   allegation" that re-affiliation with Defendants is "unwanted" because the benefits

11   of association with the BCTD are not worth the costs does not spontaneously

12   defeat their argument.  Compl. ¶ 5, 131, 193.  In situations such as this case

13   Plaintiffs would assuredly receive something of value in return for their payment

14   (i.e. collective bargaining rights, etc.) regardless of whether it was "wanted," thus,

15   the case law cited by both parties indicates that the salient question is whether

16   Plaintiffs had some pre-existing entitlement "to be free of the fear [it] was quelling

17   in order to give property to the defendant … [and thus] the 'something of value'

18   the victim receive[d] [was], as a matter of law, 'imposed, unwanted, superfluous,

19   and fictitious." *Brokerage Concepts*, 140 F.3d at 525 (*citing Viacom Int'l*, 747

20   F.Supp. at 213).  Neither party directly addresses this question in their briefing.

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING
DEFENDANTS' MOTION TO TRANSFER ~ 25

However, from the record before it, the Court is unable to identify any pre-existing entitlement by the Plaintiff to be free of any perceived fear that may be suppressed by giving certain property to the Defendants.  Thus, the Court determines that in the context of this case, the Complaint fails to adequately plead the "wrongful use" of economic fear that would amount to extortion, as opposed to hard bargaining, when two unions are competing for members, such that one union should be unfettered to pursue members and recruits, collect monthly dues from members, recruit and train members and otherwise participate in union business free from interference, negotiate their own labor agreements, resolve jurisdictional disputes, determine which political candidates to support or oppose (*see* ECF No. 90 at 18 (*citing* Compl. ¶ 2)).

### c.  Extortion through Force

As opposed to an allegation of extortion through economic fear, a defense of "lawful claim" to the property is not a defense when the extortionate acts are carried out by use or threats of force.[3] *United States v. Daane*, 475 F.3d 1114, 1119-20 (9th Cir. 2007).  Plaintiffs allege that Defendants committed attempted

---

[3] Plaintiffs acknowledge the exception to this rule that the Hobbs Act does not apply to use of force to achieve legitimate labor ends, such as obtaining higher wages from an employer through collective bargaining. *See Enmons*, 410 U.S. at 400-401.

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO TRANSFER ~ 26

1    extortion under the Hobbs Act by taking substantial steps to obtain property of

2    Plaintiffs, with the intent to obtain that property, through use of actual and

3    threatened use of force. *See United States v. Cain*, 671 F.3d 271, 279 (2nd Cir.

4    2012) (attempted extortion did not require plaintiffs to establish that defendants "in

5    fact obtained any specific property belonging to the extortion victims but merely

6    that they intended to do so and took a substantial step in furtherance of that goal");

7    *see also Chevron Corp. v. Donziger*, --- F.Supp. 2d---, 2012 WL 1711521, at *10

8    (S.D.N.Y. May 14, 2012)("[t]he fact that the RICO defendants have not succeeded

9    in obtaining the desired payoff is immaterial to the question whether [plaintiff]

10   sufficiently has alleged Hobbs Act extortion as a predicate act.").  The threats of

11   force alleged in Plaintiffs' Complaint include: death threats (Compl ¶ 14, 177),

12   other physical violence (¶ 30, 295-302), threatening or damaging Plaintiff's

13   property (¶ 14, 39, 160, 295-304, 324), and publicly disseminating video footage of

14   a violent attack on UBC members (¶ 11, Ex. C.)  Defendants contend that Plaintiffs

15   fail to adequately allege that any Defendant or agent of a Defendant committed the

16   alleged threats or vandalism.  The Court agrees.

17                    **i.    Attempt and Conspiracy**

18         Plaintiffs' argument that the law of attempt and conspiracy somehow

19   encompasses the conduct in this case is misplaced.  Adding principles of attempt

20   and conspiracy do not cure the problems in the Complaint.  Plaintiffs' citation to an

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING
DEFENDANTS' MOTION TO TRANSFER ~ 27

unsiftable mix of criminal and civil RICO cases is of little help to the Court.  Not every principle in the criminal law applies to a civil RICO case.  The Supreme Court explained:

> [I]n *Beck v. Prupis*, 529 U.S. 494, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000) . . .  [] we considered the scope of RICO's private right of action for violations of § 1962(d), which makes it "unlawful for any person to conspire to violate" RICO's criminal prohibitions.  The question presented was "whether a person injured by an overt act in furtherance of a conspiracy may assert a civil RICO conspiracy claim under § 1964(c) for a violation of § 1962(d) even if the overt act does not constitute 'racketeering activity.' " *Id.*, at 500, 120 S.Ct. 1608. Answering this question in the negative, we held that "injury caused by an overt act that is not an act of racketeering or otherwise wrongful under RICO is not sufficient to give rise to a cause of action under § 1964(c) for a violation of § 1962(d)." *Id.*, at 505, 120 S.Ct. 1608 (citation omitted). In so doing, we "turn[ed] to the well-established common law of civil conspiracy." *Id.*, at 500, 120 S.Ct. 1608. Because it was "widely accepted" by the time of RICO's enactment "that a plaintiff could bring suit for civil conspiracy only if he had been injured by an act that was itself tortious," *id.*, at 501, 120 S.Ct. 1608, we presumed "that when Congress established in RICO a civil cause of action for a person 'injured ... by reason of' a 'conspir[acy],' it meant to adopt these well-established common-law civil conspiracy principles," *id.*, at 504, 120 S.Ct. 1608 (quoting §§ 1964(c), 1962(d); alterations in original). We specifically declined to rely on the law of criminal conspiracy, relying instead on the law of civil conspiracy.

*Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 650-51 (2008).  More recently, the Supreme Court highlighted the early attachment of criminal conspiracy liability as compared to the much later attachment of civil liability under the RICO statute:

> Under § 371, a conspiracy is an inchoate crime that may be completed in the brief period needed for the formation of the agreement and the

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO TRANSFER ~ 28

commission of a single overt act in furtherance of the conspiracy. *See United States v. Feola*, 420 U.S. 671, 694, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975). Section 1962(c) demands much more: the creation of an "enterprise"—a group with a common purpose and course of conduct—and the actual commission of a pattern of predicate offenses.

*Boyle v. United States*, 556 U.S. 938, 950 (2009). "It is elementary that a [criminal] conspiracy may exist and be punished whether or not the substantive crime ensues, for the conspiracy is a distinct evil, dangerous to the public, and so punishable in itself." *Salinas v. United States*, 522 U.S. 52, 65 (1997). That is not so for civil conspiracy. Liability for a criminal conspiracy may be complete at an early stage, but for there to be civil liability under RICO, section 1964(c) requires among other elements, the actual commission of a pattern of predicate RICO offenses and a compensable injury flowing directly from those illegal predicate acts.

Plaintiffs allege that Defendants committed attempted extortion under the Hobbs Act by taking "substantial steps" to obtain property of Plaintiffs, citing a host of criminal cases for this proposition. ECF No. 90 at 13-14. However, Plaintiffs fail to appreciate the difference between civil liability and the much broader criminal laws. Assuming arguendo that Defendants committed attempted extortion, Plaintiffs are correct that attempted extortion is a predicate act under RICO. However, the Complaint in this case does not articulate a "compensable

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO TRANSFER ~ 29

injury" that flows from attempted extortion for which the civil RICO laws provide a remedy.

### ii.    Co-conspirator Liability

Plaintiffs argue that the Complaint adequately alleges that all of the Defendants agreed to work together on the "campaign" to "attack" Plaintiffs in their pursuit of the shared goal of obtaining control over Plaintiff's property. Compl. ¶¶ 129, 140.  Defendants cite to a laundry list of agreements between Defendants, including but not limited to: Ault and Molnaa's role in planning the expulsion of Plaintiffs from the MTD (Compl. ¶ 24-28, 226-245, 383-88), Defendant Williams' authorization to "push back the Carpenters," the formation of the anti-Plaintiff "Committee" (Compl. ¶ 18), the authoring and approving public attacks of Plaintiffs (Compl. ¶ 7, 11, 168, 197), and the "personal incitement of others to violence" (Compl. ¶ 15). ECF No. 90 at 27.

Even in the light most favorable to the Plaintiffs, the Court fails to see how this conspiracy argument addresses the Complaint's failure to sufficiently allege that the individuals who committed vandalism and threats of force were the Defendants themselves or their agents. With regard to these activities, the Complaint uses the phrase "agents" not "co-conspirators." Plaintiffs' briefing on this issue focuses on an argument that the Defendants conspired with each other, not that they conspired with the individuals accused of vandalism and violence.

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO TRANSFER ~ 30

With the exception of Eric Gustafson there is no allegation that any of the few individuals who allegedly committed acts of vandalism or threats of force actually entered into an agreement with any of the Defendants. As to Gustafson, the Complaint alleges that he "agreed to act, and was acting, on behalf of the BCTD Defendants." Compl. ¶ 110.  This legal conclusion, with no additional facts to establish any actual contact between the Defendants and the individuals accused of vandalism and threats of force, much less actual agreement, does not plausibly plead a claim that the individuals accused of vandalism and threats of force were co-conspirators with the Defendants.

### iii.    Agency Liability

Defendants contend that Plaintiffs fail to adequately allege that any Defendant or agent of a Defendant committed the alleged threats or vandalism. General rules of agency are applicable to civil RICO claims. *See Brady v. Dairy Fresh Products Co*., 974 F.2d 1149, 1154 (9th Cir. 1992).  To establish an agency relationship, a plaintiff must allege that both the principal and the agent have manifested an assent that the principal has a right to control the agent.  *See BE&K Const. Co. v. United Bhd. of Carpenters and Joiners of America, AFL-CIO*, 90 F.3d 1318, 1326 (8th Cir. 1996) ("an essential element of any agency claim is that the asserted principal has the right to control the actions of the asserted agent").  An agent's authority to act on behalf of the principal can be express or implied.

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO TRANSFER ~ 31

*Hawaiian Paradise Park Corp. v. Friendly Broadcasting Co.*, 414 F.2d 750, 755 (9th Cir. 1969).  In the context of union disputes, an international parent union can only be held liable for the actions of a local union if the local is acting as an "agent" under common law agency principles.  *Laughon v. Int'l Alliance of Theatrical Stage Employees*, 248 F.3d 931, 935 (9th Cir. 2001); *see also BE&K Const. Co.*, 90 F.3d at 1326-27 (finding insufficient evidence to support an inference that one union was the "agent" of another union when there was no evidence of control and "cooperation in the spirit of labor solidarity does not transform one union into the agent of another.")

Defendants argue that the Complaint fails to identify any person, Defendant or non-Defendant, who committed acts of vandalism.  The Complaint alleges that "unnamed individuals" vandalized work trucks, spray painted anti-Carpenter logos on work buildings, vandalized a construction sign, and smashed a sign.  Compl. ¶ 156, 305.  The Complaint identifies alleged wrongdoers as "BCTD Defendants' agents." *Id.* at ¶¶ 10, 14, 30, 156, 323.  Similarly, Defendants contend that with respect to allegations of threatened violence, the Complaint names several individuals who were not employed by Defendants and labels them again as "BCTD Defendants' agents."  *Id.* at ¶¶ 14, 162 (Tim Schoemehl and Stephen Schoemehl were identified as "BCTD Defendants' agents" and "a business agent for IBEW Local #1 in St. Louis" as authors of an email that told an officer of the

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO TRANSFER ~ 32

UBC in St. Louis that the "walls are closing in on you"), ¶ 304 (alleging Eric

Gustafson of Ironworkers Local #86 "rushed" UBC representatives leafleting in

Seattle).  Defendants argue that these types of "conclusory allegations" of agency

are insufficient to survive a 12(b)(6) motion to dismiss.  ECF No. 58 at 17-18.

Defendants maintain that Plaintiffs did not sufficiently allege that Defendants had

the "right to control" any of the alleged perpetrators, and the only identified

individuals are employed by non-Defendant local unions.

Plaintiffs respond with the general argument that Defendant BTCD and

Defendants Ault and Williams initiated the anti-Plaintiffs campaign and "called on

all Building Trades union members and officials nationwide to take anti-

Carpenters actions – legal and illegal – on behalf of the campaign... [and] at their

leaders' urging, subordinate union members and representatives around the country

engaged in anti-Carpenters threats and vandalism."  ECF No. 90 at 28 (citing

Compl. ¶¶ 10-12, 15-21, 142, 200).  Plaintiffs also briefly advance a respondeat

superior argument based on Defendants' alleged approval and ratification of

wrongful acts because they did not stop or discourage them.  ECF No. 90 at 29.

The Court finds that the repeated allegations made by Plaintiffs that both

named and unnamed individuals acted as "BCTD Defendant's agents" when

committing acts of vandalism and threats of violence is merely a formulaic legal

conclusion prohibited under *Iqbal* and *Twombly*.  *See Iqbal*, 556 U.S. at 678.

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING
DEFENDANTS' MOTION TO TRANSFER ~ 33

1    Plaintiffs failed to plead facts showing that the putative agents committing these

2    acts were subject to the control of "BCTD Defendants."

### iv.    Norris LaGuardia Act ("NLGA")

4    Under the NLGA, an "association or organization participating or interested

5    in a labor dispute," and its officers, cannot be liable for the "unlawful acts of

6    individual members, or agents, except upon clear proof of actual participation in,

7    or actual authorization of, such acts, or of ratification of such acts after actual

8    knowledge thereof."  29 U.S.C. § 106.  Defendants contend that the NLGA applies

9    to RICO claims and predicate acts of extortion that arise out of a labor dispute, and

10   Plaintiffs fail to allege that Defendants are responsible for the alleged threats of

11   violence by non-Defendants under this "heightened standard." ECF No. 58 at 20.

12   Defendants argue that the "fiery rhetoric" in a speech by Defendant Williams

13   when speaking at a St. Louis large union rally including "line in the sand" and "no

14   going back" was not enough to infer that Williams was responsible for any acts of

15   violence or vandalism committed by others, especially when the first alleged threat

16   of violence occurred 16 months after this rally. ECF No. 58 at 21 (citing Compl. ¶

17   173).

18   Plaintiffs respond that the NLGA was enacted "decades" before RICO so

19   "Congress could not have intended the NLGA to lessen liability under RICO."

20   ECF No. 90 at 30. Plaintiffs also contend that the RICO claims in the instant case

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING
DEFENDANTS' MOTION TO TRANSFER ~ 34

do not center on an employee-employer relationship and thus do not qualify as a "labor dispute" invoking the NLGA.  Last, Plaintiffs argue that the NLGA argument is "premature" because it is an evidentiary rule and does not apply at this stage of the proceedings, and even if the NLGA did apply Defendants lose NLGA protection because they participated by "knowing tolerance" in illegal actions. ECF No. 90 at 31.

The Court finds it unnecessary to reach this issue because the Complaint fails to adequately plead any agency relationship.

### v.    First Amendment

Defendants argue that it would be a violation of the First Amendment to hold Defendant Williams responsible for unnamed individuals' alleged vandalism and threats of violence based on "rhetorical phrases" in his speech at a union rally including "line in the sand" and "no going back." ECF No. 58 at 21 (citing Compl. ¶ 173).  In *NAACP v. Claiborne Hardware*, the Supreme Court held that "emotionally charged rhetoric" in a public speech that included the statement that "any 'uncle toms' who broke the boycott would 'have their necks broken' by their own people" did not cross the line from protected speech into unprotected incitement of lawless conduct. 458 U.S. 886, 900 (1982) (incidents of violence allegedly imputed to the speaker also occurred weeks or months after the speech). Thus, Defendants argue that Williams' much tamer statements are similarly

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO TRANSFER ~ 35

protected in this case. ECF No. 58 at 22-23. Defendants also contend that rhetoric used by non-Defendants, such as Terry Sullivan asking the audience if anyone "had any rope," is protected speech and also fails under the agency theory discussed supra. ECF No. 58 at 23 n.3 (citing Compl. ¶ 17).  Plaintiffs simply respond that extortionate and conspiratorial speech is not protected under the First Amendment, but make no argument that the speech at issue is in fact extortionate. ECF No. 90 at 31.

Since the Complaint fails to adequately plead an agency relationship between the person making a speech and the allegedly much later acts of vandalism, it is unnecessary to rule on this constitutional defense.

### d.  Non-Extortion Predicate Acts

Plaintiffs also allege predicate acts under § 302 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186, and § 501(c) of the LMRDA.

### i.    LMRA § 302

Under LMRA § 302, it is a crime for a labor organization to accept a payment of "money or other thing of value" from an employer. 29 U.S.C. § 186. Plaintiffs allege that (1) California Unions for Reliable Energy ("CURE") is a labor organization that "agreed to act and was acting, on behalf of the Defendants" (Compl. ¶ 91) and used "extortionate tactics, which also violate Section 302 of the LMRA, 26 U.S.C. § 186 because employers give money or anything of value to

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO TRANSFER ~ 36

labor organizations….” (Compl. ¶ 327); and (2) Boilermakers Local Union #104

and its officers Dan Calhoun and Gary Powers “agreed to act, and [were] acting”

on behalf of the Defendants when Local 104 accepted money from employers.

(Compl. ¶¶ 122-24, 404-411).

As to the first allegation regarding CURE, the Court finds this is a textbook

example of the type of “legal conclusion” under *Iqbal* that is insufficient to state a

claim. Plaintiffs cite to no part of the Complaint that offers any factual content to

support this bare legal assertion.  As to the second allegation, as discussed supra,

the Complaint makes the conclusory allegation that the Boilermakers union and

two of its officers were co-conspirators with the Defendants because they “agreed

to act, and [were] acting” on behalf of the Defendants, but there is no specific

reference to how or when this agreement took place.  Thus, the Court finds that the

Complaint fails to adequately plead a violation of LMRA § 302.

### ii.    LMRDA § 501(c)

Under § 501(c),

> Any person who embezzles, steals, or unlawfully and willfully
> abstracts or converts to his own use, or the use of another, any of the
> moneys, funds, securities, property, or other assets of a labor
> organization of which he is an officer, or by which he is employed,
> directly or indirectly. . . [is guilty of a felony].

29 U.S.C. § 501(c). The Ninth Circuit has held that the “essence” of this crime is

the “taking of another’s property knowing that the other person would not have

ORDER GRANTING DEFENDANTS’ MOTION TO DISMISS AND DENYING
DEFENDANTS’ MOTION TO TRANSFER ~ 37

wanted that to be done." *United States v. Thordarson*, 646 F.2d 1323, 1333 (9th Cir. 1981) (*citing United States v. Silverman*, 430 F.2d 106, 126-27 (2nd Cir. 1981)).  Fraudulent intent and conversion to defendant's own use or the use of another are elements of § 501(c), however, "lack of authorization or lack of good faith belief in union benefit" are not essential elements of this claim.  *Id*. at 1334-35.

The chain of facts alleged by Plaintiffs is as follows: Defendant and MTD President Ault circulated a memorandum indicating that proposed plans to revoke the Solidarity Agreement between the UBC and MTD might not be in "anyone's best interests" (Compl. ¶ 25-26, Ex. E); Ault "comes around" after "BCTD Defendants made [him] an offer he could not refuse" (Compl. ¶ 27); at the behest of the BCTD, Ault (and Williams as a member of the MTDs Executive Council) voted to revoke the Solidarity Agreement with UBC; this action benefited Ault and Williams "financially and personally." (Compl. ¶ 376-388).  Thus, Plaintiffs' Complaint alleges that Defendants Ault and Williams "wrongfully misused the MTD's money, funds, property, or other assets by expending and using their money, resources, staff time, and attorney time formulating, implementing, managing and operating the Push-Back-Carpenters Campaign extortionate schemes and conspiracy."  Compl. ¶ 381.  Further, Plaintiffs' allege that Defendants Ault and Williams "knew their actions were unlawful and had a bad and evil purpose"

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO TRANSFER ~ 38

because Defendants ignored Ault's memo, attempted to conceal the "true reasons" for actions taken against Plaintiffs, and BCTD agreed to indemnify the MTD for loss of income and legal costs resulting from this lawsuit.  Compl. ¶ 388.

Defendants argue that they could not have acted with the requisite "fraudulent intent" because they were acting with the full knowledge and approval of the Executive Council of the MTD, and the Council made this decision after receiving full disclosure of potential disadvantages of this course of action from Ault.  ECF No. 58 at 28 (citing Compl. ¶ 232- 237).  Moreover, Defendants argue that this action by the MTD Executive Council establishes that the union did want Defendants' work in terminating the Solidarity agreement to be accomplished. *Thordarson*, 646 F.2d at 1333.

The Court finds there can be no fraudulent intent to convert property of the MTD by its officers if the actions taken were with the full knowledge of the MTD Executive Council.  Even assuming this to be a crime, which it is not, Plaintiffs have no standing to assert an injury to their business or property by the conduct constituting the violation. Plaintiffs fail to adequately plead the alleged predicate act of a LMRDA § 501(c) violation.

For all of the foregoing reasons, the Court finds that Plaintiffs' Complaint fails to plead the racketeering activity (known as predicate acts) element of a civil RICO claim.

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO TRANSFER ~ 39

### 3.  Pattern of Racketeering Activity

In order to establish the RICO pattern element, (1) the RICO defendant must have engaged in at least two related acts of racketeering activity (18 U.S.C. § 1961), and (2) those predicate acts must satisfy the "continuity requirement." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 237-242 (1989). Defendants argue that Plaintiffs' Complaint fails to satisfy the RICO pattern element.  In light of the Court's ruling that Plaintiffs have failed to adequately plead both the injury and racketeering activity (predicate acts) elements, the Court finds it unnecessary to address this element.

### C.    Eighth Claim for Relief - LMRDA Title I

The LMRDA provides that no member of a labor organization may be suspended or expelled, except for non-payment of dues, unless such member has been "(A) served with written specific charges; (B) given a reasonable time to prepare his defense, and (C) afforded a full and fair hearing.  29 U.S.C. § 411(a)(5).  Plaintiffs claim that Defendants Ault, Williams and Molnaa are officers of the MTD and violated the LMRDA rights of both the UBC and the individual Plaintiffs when it revoked the Solidarity Agreement without providing due process rights under § 411(a)(5).  Compl. ¶ 471.

Defendants argue that this claim is built on the misguided premise that a labor organization, such as the UBC, that has an affiliation agreement with a

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO TRANSFER ~ 40

federation of labor organization, such as the MTD, is a "member" of that

federation who is entitled to due process rights under the LMRDA.  ECF No. 58 at

44.  Defendants rely on a Ninth Circuit case in which the UBC prevailed in arguing

that the LMRDA guarantees the right of free speech (§ 411(a)(2)) only to

individual union members, and not to entities such as local unions as a whole.  *See*

*United Bhd. of Carpenters Local 42-L v. United Bhd. of Carpenters*, 73 F.3d 958,

964 (9th Cir. 1996) ("Local 42-L"). The Court held that

> Section 411(a)(2) provides that a union "member" has the right "to express
> at meetings of the labor organization his views." § 411(a)(2) (emphasis
> added). If the definition of "member" included local unions, then the statute
> would provide that every "member" has a right "to express at meetings of
> the labor organization his or its views." Moreover, Title I of the LMRDA
> was "aimed at enlarged protection for members of unions paralleling certain
> rights guaranteed by the Federal Constitution." *Finnegan v. Leu*, 456 U.S.
> 431, 435 (1982).  In fact, "[i]t is readily apparent, both from the language of
> these provisions [§§ 411(a)(1) and (2) ] and from the legislative history of
> Title I, that it was rank-and-file union members-not union officers or
> employees, as such-whom Congress sought to protect." *Id*. at 436-37.
> Therefore, only individual members should have standing to bring claims
> alleging violations of the free speech rights guaranteed by § 411(a)(2).

*Id*. (emphasis in original).  Further, Defendants argue that the 19 individual

Plaintiffs also have no standing to bring a claim of due process under the LMRDA

because the lawful termination of the Solidarity Agreement between UBC and

MTD terminated any rights held by UBC members as a result of that agreement.

ECF No. 58 at 47.

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING
DEFENDANTS' MOTION TO TRANSFER ~ 41

Plaintiffs respond that the UBC has associational standing to sue on behalf of its members. *See Serv. Employees Intern. Union, AFL-CIO, CLC v. Local 1199 N.E.*, 70 F.3d 647, 654 n.10 (1st Cir. 1995) (union has associational standing to sue under LMRDA § 101(a)(4)). Further, Plaintiffs argue that *Local 42-L* is distinguishable because it addresses the free speech provision of the LMRDA as opposed to the due process provisions at issue in the instant case.  Plaintiffs cite to non-binding case law from the First and Third Circuit finding that a union did have standing to assert LMRDA claims on behalf its members for violation of right to assembly and right to sue, respectively, and Plaintiffs argue that due process rights are more akin to these rights than the rights to free speech in *Local 42-L.  See id.; see also United States v. Local 560 (I.B.T.)*, 974 F.2d 315, 346 (3rd Cir. 1992). Plaintiffs also contend that, as alleged in their Complaint, the 19 individual Plaintiffs were members in good standing with the MTD, and certain Defendants caused Plaintiffs to be expelled from membership without due process as required under § 411(a)(5).  ECF No. 90 at 49.

The Court agrees with Defendants' argument that the reasoning applied by the Ninth Circuit in *Local 42-L* to the free speech provision of § 411 applies with the equal force to the due process provision.  Both provisions are part of Title I, and both employ the personal pronoun "his" which implicates the rights of individual members instead of labor organizations.  Plaintiffs' argument that it has

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO TRANSFER ~ 42

associational standing on behalf of its members is inapposite here because the

Court in *Local 42-L* expressly held that local unions do not have standing to bring

claims under § 411(a)(2) to vindicate the rights of their members. *Local 42-L*, 73

F.3d at 964.  The Court recognizes the general rule that unions have standing to sue

on behalf of its members if the prerequisites of associational standing are met.  *See*

*Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977); *Int'l Bhd. of*

*Elec. Workers, AFL-CIO Local 1245 v. Citizens Telecomms. Co.*, 549 F.3d 781,

789 (9th Cir. 2008).  However, if the Court were to accept UBC's associational

standing argument as to this provision of LMRDA § 411(a), it would render the

express holding of *Local 42-L* meaningless.  The Court finds that UBC does not

have associational standing to bring Count VIII on behalf of its members.

Conversely, the Court rejects Defendants' circular argument that the very

action the Plaintiffs claim was a violation of their due process rights under the

LMRDA (termination of the Solidarity Agreement between the UBC and MTD)

also terminates their standing to bring an LMRDA claim. Thus, the only question

the Court must answer in order to determine whether individual Plaintiffs have

standing to assert a due process claim under LMRDA § 411(a)(5), is whether these

individuals were "members" of the MTD at the time the Solidarity Agreement was

revoked. Under the LMRDA, a "member … when used in reference to a labor

organization, includes any person who has fulfilled the requirements for

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING
DEFENDANTS' MOTION TO TRANSFER ~ 43

1    membership in such organization…." 29 U.S.C. § 402(o).  The Complaint alleges

2    that "at all material times … the Individual Plaintiffs were members in good

3    standing of the MTD and its Councils."  Compl. ¶ 471.   In evaluating a motion to

4    dismiss, the Court must accept all well-pleaded all facts as true.  Thus, in the light

5    most favorable to the Plaintiffs, on this record the Court would find that the

6    individual Plaintiffs have standing to bring a due process claim under  LMRDA §

7    411(a)(5).

8         However, FRCP 8(a) requires Plaintiffs to make a demand for the relief

9    sought.  Here, the only relief sought by Plaintiffs on this claim is injunctive relief

10   "ordering the Defendants restore all of Plaintiffs' rights and privileges as members

11   of the Metal Trades Department and Councils."  ECF No. 1 at 244.  Plaintiffs face

12   two insurmountable hurdles.  First, they have not named the Metal Trades

13   Department as a Defendant (see Compl. ¶ 71, specifically disavowing that MTD is

14   a Defendant) and second, they have made it perfectly clear to the Court that they

15   no longer wish to be affiliated with the named Defendant BCTD, and have

16   adamantly refused re-affiliation (and the payment of dues) for "services neither

17   requested, wanted, nor necessary."  Indeed, the entire crux of the Complaint

18   espouses disaffiliation.  Accordingly, the Eighth Claim for relief fails.

19   **D.    State Law Claims**

20        The Fifth and Sixth Claims for Relief are the state law equivalents of the

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING
DEFENDANTS' MOTION TO TRANSFER ~ 44

federal RICO claims.  They fail for the same reasons discussed supra and the Court

declines to exercise supplemental jurisdiction over them. The Seventh Claim for

Relief is Plaintiff PNRCC's claim for Defendants tortious interference with

PNRCC's contract with their Seattle attorneys.  Since PNRCC has no other viable

claims, the Court declines to exercise supplemental jurisdiction over this claim.

The Ninth Claim for Relief asserts a common law breach of fiduciary duties claim

which is replete with "labels and conclusions" and for which the Court declines to

exercise supplemental jurisdiction.

## II.   Motion to Transfer

In their Motion to Transfer, filed on May 23, 2012, Defendants argued two

distinct theories for why this case should be transferred to the District of Columbia:

(1) the Court lacked personal jurisdiction Defendants Ayers, Hill, and Williams,

and (2) pursuant to 28 U.S.C. § 1404(a) the proper course would be to transfer the

case to the District of Columbia "in the interest of justice" and "for the

convenience of the parties."  ECF No. 45 at 1-2.  Plaintiffs then moved for targeted

discovery relevant to proving personal jurisdiction over these Defendants did exist;

a request which was granted in part by the Court on August 2, 2012.  ECF No. 65,

85.  In the interim, Plaintiffs voluntarily dismissed Defendant Ayers, who died

after the case was filed.  ECF No. 83.  On September 6, 2012, Defendant Williams

withdrew his defense of lack of personal jurisdiction, thereby narrowing the

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING
DEFENDANTS' MOTION TO TRANSFER ~ 45

grounds for Defendants' Motion to Transfer to Hill only.  ECF No. 91.  On October 10, 2012, Plaintiff dismissed all claims against Defendant Hill.  ECF No. 122.  For all of these reasons the argument as to the personal jurisdiction over these three defendants (Ayers, Hill, and Williams) is now moot.

Defendants' argument that this case should be transferred to the District of Columbia pursuant to 28 U.S.C. § 1404(a) "for the convenience of the parties" is also now moot with the dismissal of the case.

### III.   Leave to Amend Complaint

The Ninth Circuit has repeatedly held that "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts."  *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000).  The standard for granting leave to amend is generous. The court considers five factors in assessing the propriety of leave to amend—bad faith, undue delay, prejudice to the opposing party, futility of amendment, and whether the plaintiff has previously amended the complaint.  *United States v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011).

Clearly, Plaintiffs put forth their best effort at articulating their case.  They have painstakingly detailed all of the facts alleged to be relevant to Plaintiffs' claims in a sprawling 246 page Complaint. The Court cannot conceive of any new

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO TRANSFER ~ 46

facts that could possibly cure the pleading.  Thus, the Court finds that leave to amend would be futile under these circumstances and declines to grant leave to amend the Complaint.

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. Defendants' Motion to Transfer to the District Court for the District of Columbia, ECF No. 45, is **DENIED** as moot.

2. Defendants' Motion to Dismiss the Complaint for failure to state a claim upon which relief can be granted, ECF No. 57, is **GRANTED**. The Complaint is dismissed, the federal claims with prejudice and the state claims without prejudice.

The District Court Executive is hereby directed to enter this Order, furnish copies to counsel, and **CLOSE** the file.

**DATED** this 4th day of December, 2012.

*s/ Thomas O. Rice*

THOMAS O. RICE
United States District Judge

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO TRANSFER ~ 47